UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CARLOS PATINO, by his father and next
friend PEDRO PATINO, and
MARIA PATINO,

        Plaintiffs,

v.

THE CITY OF REVERE, OFFICER
CHARLES CALLAHAN, OFFICER
JOSEPH DELUCA, MASSACHUSETTS
STATE TROOPER PAUL MCCARTHY
TROOPER JESSE SWEET, and OTHER
AS YET UNNAMED LAW
ENFORCEMENT OFFICERS OF THE
REVRE POLICE DEPARTMENT, THE
METRO BOSTON GANG UNIT AND/OR
THE MASSACHUSETTS STATE POLICE

        Defendants

Civil Action No. 13-cv-11114-LTS

| 03/08/2016 | District Judge Leo T. Sorokin: ELECTRONIC ORDER entered The Court has undertaken de novo review of Magistrate Judge Cabell's Report and Recommendation 123 and considered both the objections of the Plaintiffs (#128) and the Defendant 129 . The Court ADOPTS the Report and Recommendation. Defendant's Motion for Summary Judgment 100 is ALLOWED in all respects EXCEPT as to Counts 3, 4, and 8. The Motion is DENIED as to these three Counts. The parties shall file a Joint Status Report within ten (10) days advising (a) whether all parties wish to go to the Court's mediation program prior to trial; and (b) whether all parties consent to the exercise of jurisdiction by the magistrate judge. (Montes, Mariliz) (Entered: 03/08/2016) |
|---|---|

**REPORT AND RECOMMENDATION ON DEFENDANT PAUL MCCARTHY'S
MOTION FOR SUMMARY JUDGMENT (Dkt. No. 100)**

February 1, 2016

CABELL, U.S.M.J.

This matter arises from an unfortunate incident.  Law enforcement officers responding to a possible breaking and entering into a dwelling encountered the plaintiff Carlos Patino in his backyard.  The plaintiff, who is a mentally disabled adult with the functional capacity of a child, fled in fright when he saw the officers.  The officers subdued and restrained the plaintiff on the ground, but released him when they realized he was not their suspect.  The plaintiff, through his father Pedro Patino, and his step-mother Maria Patino, initially brought a 12 count suit against several officers and agencies but the suit has narrowed over time and now consists of six claims against the defendant, Massachusetts State Police Trooper Paul McCarthy (Trooper McCarthy or the defendant).  The plaintiffs claim violations under 42 U.S.C. § 1983 of the Fourth and the Fourteenth Amendments to the U.S. Constitution, and additionally invoke the Court's 28 U.S.C. § 1367 supplemental jurisdiction to entertain certain common law claims.  Now pending is the defendant's motion for summary judgment on all counts.  For the reasons discussed below, the Court recommends that the motion be granted in part and denied in part.

## I.    RELEVANT FACTS

The following facts are taken from the parties' Statements of Facts (Dkt. Nos. 102, 119) and the evidence submitted in connection with the defendant's summary judgment motion.  As is required on summary judgment, the facts are presented in the light most favorable to the plaintiffs as the non-moving party.

On the afternoon of May 7, 2010, Trooper McCarthy was sitting in an unmarked car as part of a stakeout on Pearl Street in Revere, MA.  (Dkt. No. 102 at ¶ 3).  At around 4:00 p.m., he saw an individual, later determined to be Steven Panzino, park an SUV and climb into the second floor window of a multi-family dwelling.  (*Id*. at ¶ 4).  Panzino was bare-chested but he was

carrying a red shirt.  Trooper McCarthy requested a check of the SUV's license plates and determined the car was stolen.  (*Id*. at ¶ 5).  Trooper McCarthy determined that the suspect had committed two criminal offenses -- breaking and entering and possession of a stolen vehicle -- and he requested backup assistance.  (*Id*. at ¶ 6).  Three additional M.S.P. Troopers and two Revere Police Officers, including Officer Charles Callahan, responded to the call.  (*Id*. at ¶ 7).

The officers then approached the dwelling to look for the suspect.  (*Id*. at ¶ 7).  Officer Callahan and Trooper McCarthy went around the back of the house and in doing so encountered Carlos Patino, who was sitting in the yard watching airplanes.  (*Id*. at ¶ 7; Exs. 7 and 8).  Maria Patino was inside the house with her eight-year-old grandson, recovering from bladder surgery. (Dkt. No. 119 at ¶ 1).

Upon seeing Officer Callahan and Trooper McCarthy the plaintiff got up and ran towards the back door of his house, yelling for his stepmother.  (*Id*. at ¶ 1; Dkt. No. 102 at ¶ 11).  Both officers yelled for the plaintiff to stop running but he continued towards the house.  (Dkt. No. 102 at ¶¶ 12-13).  Officer Callahan reached the plaintiff first and the plaintiff tried to push him away.  (*Id*. at ¶ 15).  Trooper McCarthy then also grabbed the plaintiff but was not able to bring him under control.  (*Id*. at ¶ 17).  All three men subsequently fell and Trooper McCarthy landed on top of the plaintiff.[1]  (Dkt. No. 119 at ¶ 5).  The plaintiff continued to struggle so the defendant, working alone since Officer Callahan had injured himself, kneed the plaintiff in the ribs once to subdue him, without success, and then did so a second time.  (Dkt. No. 102 at ¶ 28).  The plaintiff stopped resisting after the second strike.  Trooper McCarthy placed the plaintiff in handcuffs.  (*Id*.)  At some point during this struggle Trooper McCarthy realized that the plaintiff was not the man he had seen enter the second-floor window.  (*Id*. at ¶ 31).

---

[1] Officer Callahan broke his leg during the struggle and fall.

Maria Patino came outside after hearing the plaintiff's screams. (Dkt. No. 119 at ¶¶ 1-2). She saw the plaintiff on the ground with his hands cuffed behind his back. (*Id*. at ¶ 4). Trooper McCarthy hit and kicked the plaintiff, and slammed the plaintiff's head into the concrete patio ground multiple times. (*Id*.) The plaintiff had a bloody nose and scratches on his face. (*Id*. at ¶¶ 8-9). Maria Patino is not sure how many times Trooper McCarthy struck the plaintiff's head but said that it "felt like a million" and "might" have been more than fifty times. (*Id*. at ¶ 4). She shouted at the officers in Spanish but neither officer understood her. (*Id*. at ¶ 7; Dkt. No. 102 at ¶ 37). (Trooper McCarthy disputes that he ever hit or kicked the plaintiff or struck his head on the ground.).

At some point a neighbor named Ileana Zenus heard the commotion and came over. She saw that Carlos Patino was on the ground but she could not recall if he was already handcuffed. She did not see Trooper McCarthy hit or kick the plaintiff. Ms. Zenus is an English/Spanish interpreter and she translated for Maria Patino and helped Trooper McCarthy to understand the plaintiff's mental limitations, which were not self-evident from his physical appearance. (Dkt. No. 102 at ¶¶ 33-34, 39). Trooper McCarthy then released the plaintiff. (*Id*. at ¶ 46). The officers offered to call an ambulance for the plaintiff but his stepmother declined because she was not able to accompany him. (*Id*. at ¶ 34 and Exs. 7-8). Instead, she called Pedro Patino and he came home and photographed the plaintiff's injuries and then took him to an emergency room. (*Id*. at ¶ 50; Dkt. No. 119 at ¶¶ 10-11).

The plaintiff was found to have suffered a fractured rib and abrasions on his head, arm and legs. He also had multiple bruises, a hematoma and swelling over his left eye. The hospital also performed a CT scan because of concern over a possible head injury. (Dkt. No. 119 at ¶ 12).

The plaintiff has a lifelong history of mental illness, outbursts and insomnia.  However, his behavior and emotional state deteriorated significantly following the incident.  He became fearful of the police and came to suffer from PTSD, anxiety and depression.  (*Id*. at ¶¶ 14-16).

The incident caused Maria Patino to suffer from depression and, because it caused her to rush from her bed, also complicated her recovery from surgery.  She also saw a psychiatrist, albeit some years later, and started taking medication.  (*Id*. at ¶¶ 19-20; Dkt. No. 102 at ¶ 52).

## II.     ANALYSIS

### A.  <u>Summary Judgment Standard</u>

Federal Rule of Civil Procedure 56 permits the Court to grant summary judgment as to any claim or part of a claim.  FED. R. CIV. P. 56(a).  The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Johnson v. Gordon*, 409 F.3d 12, 16–17 (1st Cir. 2005) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving party to show "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*. at 258.

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor.  *Johnson*, 409 F.

3d at 17.  Summary judgment is appropriate if, after viewing the record in the non-moving

party's favor, the Court determines that no genuine issue of material fact exists and that the

moving party is entitled to judgment as a matter of law.  *Id.*

### B.  The § 1983 Claims, Counts One, Two and Three

Counts One, Two and Three of the complaint charge violations of 42 U.S.C. § 1983,

which reads:

> Every person who, under color of any statute, ordinance,
> regulation, custom or usage, of any State or Territory, subjects, or
> causes to be subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and
> laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proceeding for redress.

Section 1983 does not create substantive rights but is rather a procedural mechanism for

enforcing constitutional or statutory rights.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).  It is

the plaintiff's burden to identify the particular underlying constitutional or statutory right that has

been impacted.  In order to prevail in a § 1983 claim a plaintiff must bring forth evidence that (1)

the defendant acted "under color of state law" and (2) deprived the plaintiff of a federally

protected right.  *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001); *DiMarco-Zappa v.

Cabanillas*, 238 F.3d 25, 33 (1st Cir. 2001); *Collins v. Nuzzo*, 244 F.3d 246, 250 (1st Cir. 2001).

In the present case, there does not appear to be any dispute that Trooper McCarthy was

acting within the scope of his duties at all relevant times.  Thus, the first element is satisfied and

the issue is whether the evidence proves (or disproves) a deprivation of a federally protected

right.

### Count One - Fourteenth Amendment Equal Protection Claim

Count One alleges that Trooper McCarthy violated the plaintiff's right to equal protection under the Fourteenth Amendment by discriminating against him on the basis of his race, ethnicity and national origin.  However, the plaintiff now concedes that there is no evidence to support this claim, and the Court agrees.[2]  Judgment should therefore be entered in the defendant's favor on Count One.

### Count Two - Fourteenth Amendment Substantive Due Process Claim

Count Two alleges that Trooper McCarthy violated the plaintiff's Fourteenth Amendment substantive due process rights by using excessive force to subdue him.  Trooper McCarthy argues that a claim of excessive force arising from an arrest or stop is most properly raised as a Fourth Amendment rather than a Fourteenth Amendment claim.  The Court agrees.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (noting that "all claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigation, stop or other seizure of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a substantive due process approach"); *see also Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (explaining that claims that law-enforcement officers used excessive force to effect a seizure are governed by the Fourth Amendment's "reasonableness" standard.); *see also Estate of Bennett v. Wainwright*, 548 F.3d 155, 163 (1st Cir. 2008) (affirming dismissal of substantive due process claim because it was "in essence an excessive force claim that should be – and is – brought under the Fourth Amendment").  By contrast, "[c]laims of excessive force by a police officer arising outside the context of a seizure, and thus outside the Fourth Amendment, are analyzed under substantive due process principles."

---

[2]In addition to submitting a memorandum in opposition to the motion for summary judgment (Dkt. No. 106), the plaintiffs also submitted a one paragraph "motion" in opposition to the motion for summary judgment.  The plaintiff therein "acknowledges that there has been insufficient evidence adduced through discovery to support" the equal protection claim.  (Dkt. No. 107).

*Cummings v. McIntire*, 271 F.3d 341, 344 (1st Cir. 2001). As there is no issue that the alleged

excessive force occurred during the course of the seizure of the plaintiff, the excessive force

claim should be analyzed under the Fourth Amendment, which is in fact what the plaintiff

alleges in Count Three. Summary judgment therefore should be entered in the defendant's favor

on Count Two.

Count Three - Fourth Amendment Excessive Force/Unlawful Arrest Claims

Although framed as a single count, Count Three appears to advance two separate Fourth

Amendment claims. It alleges that Trooper McCarthy unlawfully arrested the plaintiff when he

"placed him under arrest without probable cause." But it also alleges that Trooper McCarthy

unlawfully "seized him and used unreasonable force against him." Because each of these

allegations seems to address a separate, discrete moment of the overall incident, the Court reads

Count Three as alleging both a claim of unlawful arrest and a claim of excessive force, and

addresses each claim separately.

The claim of unlawful arrest

Trooper McCarthy argues that the officers did not arrest the plaintiff; rather, they

properly stopped and detained him as part of their investigation. "A detention at the hands of a

police officer constitutes a seizure of the detainee's person and, thus, must be adequately

justified under the Fourth Amendment." *Morelli v. Webster*, 552 F.3d 12, 19 (1st Cir. 2009). A

police officer who has "reasonable suspicion to believe that criminal activity may be afoot," may

detain an individual for a brief investigatory stop, commonly referred to as a "*Terry* stop" after

the case that established the standard for such stops. *United States v. Sokolow*, 490 U.S. 1, 7

(1989) (cited in *Huckins v. McSweeney*, No. 11-cv-106-JD, 2012 WL 3308395, *4 (D.N.H. Aug.

13, 2012)). In contrast, a valid arrest requires meeting the higher standard of probable cause.

*Nelson v. City of Cambridge*, 101 F. Supp. 2d 44, 47 (D. Mass. 2000) (citing *United States v. Quinn*, 815 F.2d 153, 156 (1st Cir. 1987)).

The line between what constitutes a temporary detentions and a de facto arrest is often blurred. *Morelli*, 552 F.3d at 19. "[T]he standard mode of inquiry is to assess the totality of the circumstances and ask whether a reasonable person in the suspect's shoes would understand herself to be subject to restraints comparable to those associated with an arrest." *Id*. at 20. Courts often focus on the length of the stop. Generally, an investigative stop should last no longer than is necessary for the police to dispel their suspicions. *Flowers v. Fiore*, 359 F.3d 24, 31 (1st Cir. 2004) (plaintiff's detention was a *Terry* stop and not an arrest where the police detained him no longer than was necessary to confirm he was not the suspect they were looking for); *United States v. Tiru-Plaza*, 766 F.3d 111, 117 (1st Cir. 2014) (where altered registration created reasonable suspicion of criminal activity, diligence of officers in lifting the hood of plaintiff's car to check for VIN weighed in favor of finding that encounter was a reasonable investigative stop); *but compare Nelson*, 101 F. Supp. 2d at 47 (factual dispute regarding whether plaintiff was detained an additional fifteen to thirty minutes after police confirmed he was not burglary suspect precluded summary judgment because jury could find that investigative detention had transformed into arrest without probable cause). The use of force or restraints, while certainly probative, does not necessarily transform an investigatory stop into an arrest, because precautions may be justified for safety reasons. *See Flowers*, 359 F.3d at 34 (handcuffing plaintiff and forcing him to his knees while police investigated whether he was the suspect they were looking for did not convert stop into arrest where use of restrains was justified for safety reasons where suspect was believed to be armed).

Applying these considerations here, the Court finds that the officers were justified in detaining the plaintiff, and their actions did not rise to the level of an arrest requiring probable cause. First, the stop was justified. The officers had a reasonable suspicion based on Trooper McCarthy's observations that a man with a red shirt was making an unlawful entry into a dwelling. When Trooper McCarthy went around to the back of the dwelling to investigate further he saw that the plaintiff (1) was a male adult, (2) was the only person present, (3) was wearing a red shirt, and (4) fled when he saw the officers. This was sufficient to give Trooper McCarthy a "specific and articulable" basis to reasonably suspect that the plaintiff might be the suspect. The reasonable suspicion standard is a "fairly low" one. *Bolton v. Taylor,* 367 F.3d 5, 9 (1st Cir. 2004) (reasonable suspicion standard is "fairly low"); *United States v. Mohamed*, 630 F.3d 1, 5 (1st Cir. 2010) (reasonable suspicion standard satisfied by showing a "specific and articulable" basis for suspecting individual of criminal activity). It is true that the plaintiff's height, weight and clothing were somewhat different from those of Panzino, the man ultimately apprehended, but these differences do not undermine the reasonableness of the defendant's suspicions given the speed with which events unfolded. "Because reasonable suspicion does not necessitate a high degree of certitude, there is no requirement that the facts on which it is grounded be unfailingly accurate." *United States v. Pontoo,* 666 F.3d 20, 28 (1st Cir. 2011)

Second, the stop was no longer than necessary to dispel the suspicion that the plaintiff might be the suspect the officers were seeking. The episode may have been elongated some by the participants' initial inability to understand each other but there is no genuine dispute that Trooper McCarthy released the plaintiff once he learned who he was. The fact that Trooper McCarthy restrained the plaintiff in handcuffs was reasonable for safety purposes and did not

transform the stop into an arrest where the plaintiff fled from the officers, failed to heed their commands to stop, and vigorously resisted their attempts to bring him under control.

In sum, the defendant did not unlawfully arrest the plaintiff without probable cause. Summary judgment should thus enter with respect to this portion of Count Three.

<u>The claim of excessive force</u>

The plaintiff's excessive force claim encompasses both the allegation that Trooper McCarthy kneed him twice in the ribs as well as the allegation that he slammed the plaintiff's head into the ground multiple times after placing him in handcuffs. (Dkt. No. 106 at pp. 6, 8). A claim that excessive force was employed during a stop or arrest is analyzed under the Fourth Amendment's reasonableness standard. *Graham*, 490 U.S. at 397. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quotations and citations omitted). The question for the Court is "whether the force used exceeded 'the force necessary' to effect the arrest from the perspective of an objectively reasonable officer at the scene, with due 'allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving.'" *Dean v. City of Worcester,* 924 F.2d 364, 367 (1st Cir. 1991) (citing *Graham*, 490 U.S. 386). This requires a fact specific inquiry taking into account the particular circumstances of the case, "'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Barbosa v. Conlon*, 962 F. Supp. 2d 316, 329 (D. Mass. 2013) (citing *Graham*, 490 U.S. at 396).

As discussed above, the officers had a legitimate basis to believe that the plaintiff was the suspect they were seeking.  It turns out that they were mistaken, but their suspicions were still justified and they therefore were entitled to do what the law would have allowed them do if the plaintiff had in fact been the suspect.  *Dean*, 924 F.2d at 368; *Hill v. California,* 401 U.S. 797, 804 (1971).  Because the plaintiff attempted to flee and then resisted the officers, the use of some force to subdue him was objectively reasonable.  *Statchen v. Palmer*, 623 F.3d 15, 18 (1st Cir. 2010).

However, a jury could conclude that the degree of force Trooper McCarthy used to subdue the plaintiff, *i.e.,* force sufficient to break his ribs, was greater than was reasonably necessary.  Similarly, a jury could conclude that Trooper McCarthy used excessive force if he in fact struck the plaintiff's head against the ground after handcuffing him.  Once an individual is apprehended and handcuffed there is no longer a need for use of force and beating a person while in the control of the police would unquestionably be excessive force.  *Jennings v. Jones,* 499 F.3d 2, 15-16 (1st Cir. 2007) (denying summary judgment because a reasonable jury could find that police officer defendant increased pressure on plaintiff's ankle after he stopped resisting, which would amount to excessive force under the circumstances); *Huckins,* 2012 WL 3308395 at *3 (testimony that defendant deployed taser after plaintiff was already on ground raised triable issue of fact regarding whether defendant used excessive force);  *Plumhoff,* 134 S. Ct. at 2022 (finding that it was reasonable for police to fire fifteen shots during a high speed chase, but noting that it would be a "different case" if the police had kept using force after the suspect was incapacitated).[3]

---

[3]The defendant argues that the Court should discredit Maria Patino's testimony that Trooper McCarthy slammed the plaintiff's head against the ground because it is contradicted by Ms. Zenus, the neighbor, and the medical evidence. The Court cannot agree.  Ms. Zenus testified that she left her home after hearing the commotion and entered the Patinos' backyard after Maria Patino.  She testified that the plaintiff was already on the ground by the time she

<u>Whether the Defendant is Entitled to Qualified Immunity</u>

The defendant argues that he is entitled to summary judgment even if excessive force was used because he enjoys qualified immunity.  "The doctrine of qualified immunity shields officials from civil liability so long as their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mullenix v. Luna*, 13 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  To determine whether a defendant is entitled to qualified immunity, a court should consider: "'(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation.'"  *Mlodzinski v. Lewis*, 648 F.3d 24, 32 (1st Cir. 2011) (citing *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009)).  The second prong has two components: "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right."  *Id*. at 32-33.

In the summary judgment context, the First Circuit has noted that qualified immunity claims "present thorny analytic problems."  *Morelli*, 552 F.3d at 18.

> The difficulty arises because the summary judgment standard
> requires absolute deference to the non-movant's factual assertions
> (as long as those assertions are put forward on personal knowledge

---

arrived and may have already been handcuffed.  Because she arrived after Maria Patino, Ms. Zenus's testimony that she did not see anyone hit or kick Carlos Patino does not necessarily contradict Maria Patino's testimony that Trooper McCarthy did hit and kick Carlos Patino.  Moreover, the plaintiff's medical records show that he suffered injuries to his head and face, including bruising, a hematoma and swelling over his left eye, and reflect that his doctors investigated the possibility of a head injury, including performing a CT scan.  The Patinos' delay in taking the plaintiff to the hospital and the allegedly "minimal" nature of his injuries are facts that may bear on the severity of the plaintiff's injuries but they are not facially inconsistent with the claim that the plaintiff received repeated blows to the head.

> or otherwise documented by materials of evidentiary quality),
> whereas qualified immunity, when raised on summary judgment,
> demands deference to the reasonable, if mistaken, actions of the
> movant.

*Id*. at 18-19 (internal citations omitted).  Thus, the First Circuit directs that a Court considering a motion for summary judgment based upon a qualified immunity defense "cabin these standards" by "first identifying the version of events that best comports with the summary judgment standard and then asking whether, given that set of facts, a reasonable officer should have known that his actions were unlawful."  *Id*. at 19.

The Court therefore deems it appropriate here to evaluate the defendant's qualified immunity claim based on the plaintiffs' version of the facts.  No one disputes that the defendant kneed the plaintiff twice in the ribs and then restrained him on the ground in handcuffs.  With respect to the more troubling allegation that Trooper McCarthy thereafter slammed the plaintiff's head into the ground, accepting the plaintiff's version of events comports with the need to defer to the plaintiff's factual assertions as the non-moving party.  *Id.*  Although Trooper McCarthy disputes the plaintiffs' allegation, he does not ever argue that he should be entitled to qualified immunity even if he slammed the plaintiff's head into the ground as alleged.  Further, although it is eminently reasonable to wonder whether and how the claim of the plaintiff's head being slammed to the ground as many as 50 or more times will hold up under more rigorous scrutiny at later stages of the case, there is at least some medical evidence in the record consistent with the plaintiff having suffered some injury to his face and head.

The relevant inquiry, then, is: (1) should the defendant have known that using force sufficient to break ribs to subdue a suspected auto thief and burglar, and/or escalating the use of force once the suspect was handcuffed and no-longer resisting, violated the suspect's right to be free of excessive force; and (2) if so, was this right clearly established on the date of the

incident?  See *Mullenix,* 136 S. Ct. at 308 (noting that when undertaking a qualified immunity analysis, rights should be defined narrowly "in light of the specific context of the case").

The Court concludes here that even if Trooper McCarthy used excessive force when he twice kneed the plaintiff to bring him under control, the use of that force was not so clearly excessive that a reasonable officer would have known that it violated the plaintiff's rights. Among other things, there is no evidence that Trooper McCarthy was seeking to harm the plaintiff or to do anything but bring him under control, and the fact that the plaintiff continued to resist after the first knee strike suggests that the application of that sort of force was not per se unreasonable.  Accordingly, even assuming that Trooper McCarthy used excessive force when he kneed the plaintiff in the ribs, he should be entitled to qualified immunity on that portion of Count Three.

However, slamming the plaintiff's head into the ground after he was handcuffed, if that is indeed what happened, is a different matter.  It seems such an obvious proposition that it hardly needs stating, but it is clear, both as a matter of law and common understanding in our society, that a police officer may not justifiably beat someone who is restrained and who has ceased resisting, and the right to be free from such force was clearly established at the time of the incident in 2010.  *See e.g., Jennings*, 499 F.3d at 16.[4]  Thus, a reasonable officer in Trooper McCarthy's position would have understood that slamming the plaintiff's head into the ground once he was immobilized and had ceased resisting was a violation of the plaintiff's rights. Consequently, where there is a genuine issue of disputed fact as to whether that is what occurred here, the defendant should not be entitled to qualified immunity or to summary judgment on the excessive force prong of Count Three.

---

[4] It is perhaps for this very reason that the defendant does not attempt to argue that he should be entitled to qualified immunity even if he did strike the plaintiff as alleged.

C.  **The Common Law Claims, Counts Four, Seven and Eight**

Count Four - Intentional Infliction of Emotional Distress

Count Four alleges that Trooper McCarthy intentionally inflicted emotional distress (IIED) on both Carlos and Maria Patino when he violently subdued the plaintiff, struck his head against the ground, and arrested him without probable cause.

To sustain a claim for intentional infliction of emotional distress under Massachusetts law, a plaintiff must show "(1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress." *Barbosa*, 962 F. Supp. 2d at 334 (citing *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144–145 (1976)).  Mere "insults, threats, or annoyances" are not actionable; "the defendant's conduct must be 'beyond all bounds of decency.'" *Id*. "Massachusetts courts are fairly liberal about allowing emotional distress claims to go to the jury and such claims should go to the jury 'if reasonable people could differ on whether the conduct is extreme and outrageous.'" *Orwat v. Maloney*, 360 F. Supp. 2d 146, 165 (D. Mass. 2005) (citing *Columbus v. Biggio*, 76 F. Supp. 2d 43, 56-57 (D. Mass. 1999)).

Trooper McCarthy argues that this claim fails because he effected a proper *Terry* stop and a *Terry* stop supported by reasonable suspicion can never rise to the level of extreme and outrageous conduct.  The Court agrees that if the defendant was merely carrying out his

obligations as a law enforcement officer, his conduct cannot be deemed extreme and outrageous as a matter of law. *Barbosa*, 962 F. Supp. 2d at 334.  Indeed, because liability for IIED is limited to conduct "utterly intolerable in a civilized community," even an unlawful arrest, without more, does not give rise to an IIED claim. *Lund v. Henderson*, 22 F. Supp. 3d 94, 106 (D. Mass. 2014) (citations omitted).  For these reasons, the defendant should be entitled to summary judgment on this count to the extent it relates to his conduct in subduing the plaintiff, *i.e.,* up to the moment the defendant placed the plaintiff in handcuffs.

However, a fact finder could conclude that Trooper McCarthy thereafter continued to unjustifiably hit and strike the plaintiff and in that event it would not be improper for the jury to find that such conduct was "extreme and outrageous" enough to support liability for IIED, rendering summary judgment inappropriate. *Morse v. Commonwealth of Mass. Exec. Office of Pub. Safety Dep't of State Police*, No. 12-40160-TSH, 2015 WL 4920027, at *10 (D. Mass. Aug. 18, 2015) (denying motion for summary judgment because a reasonable juror could find that police officer defendants "knew or should have known that emotional distress was a likely result of breaking in to the [plaintiffs'] home without a warrant, arresting [one plaintiff] at gunpoint and handcuffing [the second] in her living room"); *Barbosa*, 962 F. Supp. 2d at 334 (denying motion for summary judgment where defendants' "use of excessive force, abusive language, and deliberate indifference to obvious medical needs would, if accepted by the jury, go beyond the bounds of acceptable conduct"); *Eason v. Alexis*, 824 F. Supp. 2d 236, 243-44 (D. Mass. 2011) (allegations that police officer defendants tackled plaintiff without cause, threw him over a railing and filed criminal complaint against him as cover-up, though a close-call, were sufficient to sustain an IIED claim).

The defendant also argues that the plaintiffs have not adduced sufficient evidence of emotional distress to survive summary judgment.  To recover for IIED, each of the plaintiffs must have suffered "severe" emotional distress.  *Fredette v. Allied Van Lines, Inc.*, 66 F.3d 369, 374 (1st Cir. 1995) (noting that the Massachusetts Supreme Judicial Court has not required a showing that the emotional distress be "of a nature that no reasonable person could be expected to endure" despite early cases containing that language and instead only requires "severe" emotional distress).  They must corroborate their mental distress claim with enough objective evidence that a reasonable jury could find that their claims are genuine.  *See Orwa*t, 360 F. Supp. 2d at 165 (inmate's own testimony that his anxiety disorder significantly worsened and that he had sought treatment were enough to withstand summary judgment even though inmate had not offered any medical records); *O'Neil v. Daimler Chrysler Corp.*, 538 F. Supp. 2d 304, 321 (D. Mass. 2008) (in a negligent infliction of emotional distress case, which has the more stringent requirement of severe emotional distress with physical symptoms, plaintiff's own testimony regarding his inability to sleep, headaches and fear sufficient to withstand summary judgment where it was corroborated by the testimony of friends and his sleeping pill prescription).  Though expert medical testimony can be offered, and is often helpful, it is not required.  *Cady v. Marcella*, 49 Mass. App. Ct. 334, 341 (2000).

The Court finds that the evidence here, while not overwhelming, is sufficient to survive a claim for summary judgment.  Both Maria and Pedro Patino testified that Carlos Patino became fearful and difficult after the incident and also began having problems sleeping.  The testimony of each parent is corroborated by the other, and their testimony is further corroborated by medical records showing that Carlos Patino was diagnosed with post-traumatic stress disorder, anxiety and depression, and began to see his psychiatrist more often.  Maria Patino also testified

that she became depressed after the incident and her testimony is corroborated by the testimony of Pedro Patino.  This is enough to put the issue before the jury.  Summary judgment should therefore be denied with respect to this claim to the extent it is based on the defendant's alleged excessive use of force after the plaintiff was restrained in handcuffs.

### Count Seven - False Arrest

Count Seven alleges a Massachusetts state law claim for false arrest based upon the same conduct alleged in Count Three.  "Typically, the elements of a false arrest claim are said to be: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and, (4) the defendant had no privilege to cause the confinement."  *Nelson*, 101 F. Supp. 2d at 48-49 (citing *Calero–Colon v. Betancourt-Lebron*, 68 F.3d 1, 3 n.6 (1st Cir. 1995)).  However, if Trooper McCarthy "had a legal privilege" to detain the plaintiff then he cannot be liable for false arrest.  *Id*.  Because the Court has concluded that the plaintiff was stopped but was not arrested, and that the stop was supported by reasonable suspicion, this claim fails as a matter of law and summary judgment should be entered in the defendant's favor.

### Count Eight - Battery

Although the defendant purports to move for summary judgment on all counts, he does not in his brief address the plaintiff's claim in Count Eight that his actions also constitute common law battery.  Regardless, where, as here, a plaintiff brings both a § 1983 excessive force claim and a common law claim for assault and battery, the Court's determination of the reasonableness of the force used with respect to the § 1983 claim controls its assault and battery analysis.  *Raiche v. Pietroski*, 623 F.3d 30, 40 (1st Cir. 2010).  Because the Court has already concluded that the relevant facts are in dispute on the excessive force claim, rendering summary judgment inappropriate, it follows that summary judgment is not appropriate here either.  *See e.g., Lund*, 22 F.Supp.3d at 105.

### III.    CONCLUSION

For the foregoing reasons, there is a genuine dispute of material fact as to whether the defendant used excessive force on the plaintiff after placing him in handcuffs.  Summary judgment should therefore be denied for any claim based on that allegation, but should otherwise be entered in the defendant's favor.  Accordingly, it is respectfully recommended that the defendant's motion for summary judgment be GRANTED with respect to Counts One, Two and Seven, as well as those portions of Counts Three, Four and Eight that are based upon conduct that occurred before the plaintiff was placed in handcuffs.  It is recommended that the motion be DENIED with respect to those portions of Counts Three, Four and Eight that are based upon the alleged use of excessive force after the plaintiff was handcuffed.

The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), will preclude further appellate review of the District Court's order based on this Report and Recommendation.  *See Keating v. Sec'y of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13 (1st Cir. 1983); see also *Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED:  February 1, 2016